IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANA GARNETT,<br><br>Defendant. | Case No. 24-CR-281 (APM) |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

For at least four years, Dana Garnett betrayed the trust placed in her as a D.C. Public School official by taking kickbacks and bribes from local vendors doing business with DCPS. Month after month, year after year, she collected a paycheck from DCPS, all while accepting envelopes stuffed with cash slipped through her car window in the parking lots of restaurants in suburban Maryland. Those kickbacks were largely generated from a fraud scheme she orchestrated against DCPS, the very agency whose budget she was paid to safeguard. Working with "her guys," Don McWhirter, Duane King, and Yelake Meseretu, she created fake orders for supplies that were never delivered. Once she and Pat Bailey, her DCPS partner-in-crime, approved the fabricated paperwork, they ensured the vendors got paid in full. In exchange for the bribes, Garnett and Bailey continued to steer business to her hand-picked vendors who were willing to play ball.

In layman's terms, Dana Garnett orchestrated a pay-for-play scheme. The vendors got valuable DCPS business. Garnett and Bailey got cash to spend at Maryland Live casino. And DCPS school kids got ripped off. As explained in more detail below, the Presentence Investigation Report ("PSR") underestimates the amount of the loss caused by the defendant's conduct. As the testimony at trial demonstrated, the defendant caused at least $95,000 in loss to the D.C. Public School system, which results in a revised U.S. Sentencing Guidelines ("U.S.S.G." or the

1

"Guidelines") range of 41-51 months of incarceration. Given her brazen conduct and the egregious breach of trust, the Court should impose a sentence of 51 months of incarceration, 36 months of supervised release, and a fine within the appropriate U.S.S.G. range. Such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

## BACKGROUND

In 2005, Dana Garnett started working as a Budget Analyst at the Central Office of the D.C. Public School ("DCPS") system, where she worked for the next seventeen years. 6/17/25 Tr. at 63-64; PSR ¶ 177. As part of her job responsibilities, she handled small and mid-level purchases for the more than one-hundred DCPS school campuses scattered throughout the District. *Id*. at 78. She was also in charge of the American Express ("AmEx") Buy Down program, which, until it was shut down, provided her with unique access and control of more than $30 million a year in DCPS funds. *Id*. at 117. As the only person in charge of the lucrative AmEx program, Garnett knew the program "inside, outside, backwards, and forwards." *Id*. at 117. She was also in charge of reconciling the AmEx budget every month.

Around 2006 or 2007, she met Patricia Bailey, her eventual co-conspirator in this case, when Bailey started working at the Central Office of DCPS. The two became friendly and remained close when Bailey became the Administrative Office at Cardozo Education Campus, one of D.C.'s oldest public schools, in 2012. As the Administrative Officer at Cardozo, Bailey was in charge of the budget and responsible for purchasing supplies necessary for the school. *Id*. at 588. Around 2018, Garnett and Bailey both began experiencing "financial troubles." 6/18/25 Tr. at 617. By virtue of her position as the AmEx administrator, Garnett knew that Bailey had extra money in the Cardozo AmEx account. *Id*. at 614-17. And because Garnett was entrusted with the AmEx pocketbook, she hatched a plan to play with the numbers.

Garnett explained to Bailey that if the two of them used the AmEx program, they could create inflated orders for supplies that would be underdelivered. The two DCPS employees could ensure the vendors were paid in full for the under-delivered orders by certifying in various ways that the orders had been fulfilled in full. When the vendors got paid the overage, Garnett said that the two of them could pocket the overpayment. *Id*. at 618-20. Shorting orders—in other words, "short shipping" is not new. In fact, Garnett's supervisor had shown her a documentary about the same exact kind of scheme at the Detroit Public Schools. Since Garnett was in charge of reconciling AmEx funds, she told Bailey they could keep the fraud hidden. *Id*. Garnett also explained that inflating orders using "consumables," such as "toilet paper, paper towels, paper, pencils, markers, anything that can't be counted after," would help keep the fraud concealed. *Id*. Although Bailey did not understand how a short-shipping scheme worked at first, Garnett showed her the ropes. *Id*. One thing Bailey did understand from the beginning, however, was that Garnett was suggesting that they commit fraud. *Id*. at 620. And that is exactly what they did.

A short-shipping scheme like the one Garnett proposed required the cooperation of a vendor. Enter Don McWhirter, the owner of General Merchandise and one of Dana Garnett's friends. *Id*. Both Bailey and McWhirter told the jury explicitly that Garnett introduced them to the idea of shorting orders of supplies in order to generate an excess payment. 6/17/25 at 190-92. As part of the fraud, McWhirter cooked up fake invoices and purchase orders that listed inflated amounts of goods and supplies than he actually delivered. *Id*. at 198-200. McWhirter then paid the amount DCPS had overpaid to Garnett, typically handing her cash through her car window in front of his company's warehouse. *Id*. at 203. In terms of frequency, McWhirter estimated he started paying bribes to Garnett in 2015 and made payments to her "[s]ometimes once a month." *Id*. at 191, 199.

3

Besides McWhirter, Garnett and Bailey accepted bribes and kickbacks from two other vendors: Duane King, owner of American Business Supplies, and Eli Meseretu, owner of U.S. Office Solutions. King explained that the first time that he made a payment to Garnett, she asked him to give her $3,500 so she could purchase a washer and dryer. 6/18/25 Tr. at 503-04. When the AmEx order King was submitting to DCPS at that time did not go through, he contacted Garnett, who told him that in order for the order to go through, King "had to do a favor for her." *Id*. Once he acquiesced to Garnett's demand, King met her in the parking lot of a Jasper's restaurant in Largo, Maryland, to hand-off the cash. *Id*. Jasper's was not the only restaurant parking lot where the Dana Garnett got paid, however. Mr. King's associate, Charles Ongele, handed Garnett $3,000 in the parking lot of a Smoothie King. 6/17/25 Tr. at 293. In exchange for the payments, Garnett and Bailey steered more business to King's company, as well as provided him with non-public information about bids. *Id*. at 509.

In addition to using consumables, Garnett and Bailey took deliberate steps to keep the fraud concealed. Garnett told Bailey to download Signal, an end-to-end encrypted messaging app, so they could communicate privately about the scheme:



4

Similarly, Garnett worked with the vendors and Bailey to create fake invoices to paper the files. As a result, piecing together the fraud with documentary evidence proved challenging. But the documents law enforcement was able to uncover documented the scheme in black and white. McWhirter, for example, cooked up a fake "Janitorial" invoice for $3,000. On that particular order, McWhirter's company did not provide anything to Cardozo. King sometimes dropped off the bribes in Bailey's mailbox:



The evidence also included quotes to Cardozo that showed quantities of goods marked out with lower numbers and packing slips that showed fewer quantities had been delivered. Pat Bailey explained that she had written those lower numbers as an instruction to Meseretu about how much to under-deliver.



And with respect to one $3,000 bribe that Bailey picked up from Meseretu on Saturday, June 12, 2021, Garnett called Bailey and demanded her cut. 6/20/25 Tr. at 700-02. Bailey messaged Meseretu that she "thought this was a private matter but [she] heard different from [her girl]:



At trial, the defense sought to undercut evidence of the defendant's fraud scheme by portraying Pat Bailey as a liar. The defense also attempted to elicit sympathy by emphasizing the

6

defendant's donations to her church. The jury, however, heard testimony that Dana Garnett knew full well that taking bribes and committing fraud was both wrong and illegal. She attended ethics trainings about gifts and fraud committed by D.C. government employees. Her co-conspirator, Don McWhirter, sent her emails about Brian Carpenter, another vendor prosecuted in Virginia, for running a short-shipping scheme. She watched a documentary about short shipping at the Detroit Public School system in which school officials were prosecuted. The jury also learned that Garnett deposited $24,000 in cash into her bank accounts and lost at least $20,000 at Maryland Live casino during the time period of the conspiracy. 6/20/25 Tr. at 102-05. After deliberating for a day, the jury found the defendant guilty of nine out of eleven counts. *See* Verdict Form, ECF No. 107.

**ARGUMENT**

Dana Garnett robbed D.C. public school kids of thousands and thousands of dollars, money that could have been used to purchase calculators, or textbooks, or fund after-school programs. Instead, she took cash in the parking lot of a Smoothie King. She bought herself a new washer and dryer. She blew through tens of thousands of dollars at Maryland Live casino. And to make matters worse? As she was fleecing DCPS, she went to work every day and collected an $84,000 annual salary. Instead of safeguarding the public fisc and honoring the trust placed in her as a public official, Dana Garnett corrupted the system. In light of the gravity of her offense, the Court should impose 51-months of incarceration followed by three years of supervised release.

### A.   **Applicable Sentencing Guidelines and Calculation of Loss**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, they are nevertheless "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

7

sentencing decisions." *Id*. at 49. Accordingly, they are the "starting point and the initial benchmark" for sentencing. *Id*.

After calculating the applicable Guidelines range, the Court must then consider the applicable factors set forth in 18 U.S.C. § 3553(a). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

The PSR calculates the total offense level as follows:

| | |
|---|---:|
| Base Offense Level, U.S.S.G. § 2C1.1(a)(1) | 14 |
| Specific Offense Characteristics | |
|     More than One Bribe, § 2C1.1(b)(2) | +2 |
|     Loss Amount. Between $15,000 and $40,000 | |
|         § 2B1.1(b)(2)(A)(iii) | +4 |
| Zero Point Offender, § 4C1.1(a)(1)-(10) | -2 |
| **Total Offense Level** | **18** |

The PSR accurately calculates the Base Offense Level and properly includes an enhancement for more than one bribe. The PSR also correctly finds the defendant eligible for the Zero Point Offender adjustment. The PSR, however, includes an unreasonably low calculation of

the loss amount.

"The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." U.S.S.G. §2B1.1 n.20; *see also* U.S.S.G. §1B1.3 (loss is calculated based on all relevant conduct, including charged and uncharged conduct). "Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court 'need only make a reasonable estimate' of the loss using a preponderance of the evidence standard." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013); *see also United States v. Bras*, 483 F.3d 103, 112 (D.C. Cir. 2007) ("loss need not be determined with precision" and may be a "reasonable estimate . . . given the available information."); U.S.S.G. §2B1.1 n.3(C).

Given that the Garnett, Bailey, and the co-conspirator vendors intentionally sought to keep their conduct covered up, determining the full scope of the fraud is not an easy task. But the Court does not need to do a full forensic accounting to arrive at a reasonable estimate of the loss. Pat Bailey pleaded guilty to causing at least $95,000 in loss to the D.C. government. *See* Bailey Plea Agreement, GX 700. There is no reason to believe that the defendant caused *less* loss than Bailey, particularly since Garnett had prior existing relationships with Don McWhirter and Yelake Meseretu. Indeed, Garnett introduced Bailey to both McWhirter and Meseretu. Allowing Garnett to be held accountable for less than Bailey would be fundamentally unfair, especially given that Bailey accepted responsibility and cooperated.

Moreover, the evidence at trial supports a loss figure of at least $95,000. As Bailey testified, approximately 70 percent of the orders that Cardozo placed with McWhirter and Meseretu's companies during the period of the conspiracy involved fraud. Bailey also testified that she and Garnett created fraudulent orders using each of the three purchase programs: AmEx, Purchase

9

Cards, and Purchase Orders. Both King and McWhirter also conceded that they had conducted the fraud using all three of the purchasing mechanisms. Finally, Bailey estimated that of the fraudulent orders she placed with McWhirter and Meseretu's companies, Garnett received a kickback about 80 or 85% of the time.

Attached as Government Exhibit 1 is a spreadsheet containing only purchase card charges made by Cardozo from 2019 to 2022 with General Merchandise and U.S. Office Solutions. The total amount of the orders with those two companies in that period was approximately $155,000. Using the estimates Bailey provided at trial, the amount of loss Garnett caused to DCPS arising only from the purchase card program and only from McWhirter and Meseretu's transactions is around $86,800. Given that this estimate only includes purchase card transactions—and does not include any loss arising from the AmEx program or from purchase orders—the $86,800 figure is categorically and demonstrably too low.

Indeed, that calculation of the loss does not include any loss attributed to King, who testified that he paid Garnett between $1,000 and $4,000 on at least four occasions. 6/18/25 Tr. at 508. Indeed, King explained that he had paid Garnett directly $3,500 in the parking lot of Jaspers. *Id*. His associate, Ongele, also paid Garnett $3,000 in the parking of a Smoothie King. 6/17/25 Tr. at 293. That figure alone results in an estimated loss caused by Garnett of $93,300. And that figure does not include any of the monthly payments made by King to Bailey—of which there were many—and which Bailey indicated that she split with Garnett about half of the time. Finally, testimony at trial established that Meseretu paid $5,000 to Garnett arising out of a May 2021 purchase order that Garnett had sent to Meseretu. *See* GX 405a.

The bottom line is that Garnett caused *at least* $95,000 in loss to DCPS. That figure is likely much higher, although the Court will likely never know the exact amount. With a loss of at

10

least $95,000, the Guidelines instruct to increase the Base Offense Level by 8 points. Garnett's revised Guidelines calculation should be as follows:

| | |
|---|---:|
| Base Offense Level, U.S.S.G. § 2C1.1(a)(1) | 14 |
| Specific Offense Characteristics | |
|     More than One Bribe, § 2C1.1(b)(2) | +2 |
|     Loss Amount. Between $95,000 and $40,000 | |
|         § 2B1.1(b)(2)(A)(iii) | +8 |
| Zero Point Offender, § 4C1.1(a)(1)-(10) | -2 |
| **Total Offense Level** | **22** |

Her revised Guidelines range should therefore be 41 to 51 months of incarceration.

**B.     The § 3553(a) Factors**

Dana Garnett perpetrated a years-long fraud and bribery scheme against the D.C. Public School system. She gave inside information and encouraged her co-conspirators to fabricate documents. She took money from DC public school kids and gave it to the casino. Such intentional misconduct is not a good look. But it is even more appalling that Dana Garnett knew better. For the reasons set forth below, a within-Guidelines sentence is an appropriate balancing of the the § 3553(a) factors.

**1. The Nature and Circumstances of the Offense**

First, the nature and circumstances of the offense justify a significant period of incarceration. Dana Garnett worked in the Central Office in a position whose sole function was to protect taxpayer dollars and ensure DCPS funds were not wastefully or fraudulently used. That is because public school kids deserve the most, but they are often provided the least. Garnett's corrupt bargains with Bailey, McWhirter, Meseretu, and King demonstrated a blatant disregard for the

11

right of D.C. taxpayers to the honest services of its public officials.

Nor was Garnett's crime a momentary lapse of judgment. To the contrary, each time she was faced with a fork in the road and had the opportunity to do the right thing, she instead seized the opportunity to keep defrauding DCPS, again and again and again. And Garnett was not desperate or destitute when she stole tens of thousands from DCPS. That dirty money went straight into her pocketbook. If she was not lining her own pockets, then she was keeping Maryland Live casino in business.

Even more appalling, she convinced others to break the law along with her. As the public official, Garnett served as a gatekeeper. McWhirter and King both testified that Garnett brought the idea of shorting orders to them. So, too, did Pat Bailey. And in fact, the first time that King paid a bribe to Garnett, she effectively coerced him to making the payment by telling him that his order would not go through unless he did her a favor.

Any abuse of the public trust is an affront to the social compact. How can taxpayers feel good about paying their fair share if everyone assumes that the system is corrupt. That is exactly what Garnett accomplished, however: she corrupted the system by exploiting her position. She saw an opportunity as a DCPS public official. And her abuse of trust is particularly egregious because the motivation was pure greed. The seriousness of her conduct demands a heavy consequence.

### 2. The Need for Deterrence and to Promote Respect for the Law

Second, the Court's sentence must also promote the rule of law, provide just punishment, and provide adequate deterrence. Sending a strong message is especially important in cases involving public officials engaged in misconduct. Along with white-collar crime, public corruption cases are "prime candidates for general deterrence" because they often are "more rational, cool,

12

and calculated than sudden crimes of passion or opportunity." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations omitted). As this case demonstrates, grift among government employees is unfortunately all too common. Many vendors doing business with government agencies consider paying bribes and kickbacks to be a cost of doing business. And many public officials, such as Garnett, believe that they are entitled to skim a little off the top. Dana Garnett added fuel to the fire that governments are inefficient, rampant with fraud and abuse, and cannot be trusted with taxpayer dollars. This Court should send a strong message to other D.C. government officials that the consequence of ripping off the taxpayers of D.C. are serious.

### 3. The History and Circumstances of Defendant

Finally, Garnett's history and characteristics do not excuse her behavior or provide a basis to depart from the recommended Guidelines range. The portrait of the defendant laid out in the PSR is of a woman who had a modest upbringing, but not one so tragic that could explain some serious mental-health problem that led to her behavior. In fact, Garnett appears to have been a source of stability to her siblings and nieces and nephews, which makes her criminal conduct even more troubling and difficult to reconcile. The bottom line is that Garnett had a far more normal upbringing than many defendants who appear before this Court. At a minimum, her history and consequences cannot explain the willingness to steal from DCPS.

### C.    Restitution

Garnett's criminal conduct is governed by the Mandatory Victims Restitution Act, 18 U.S.C. §3663A ("MVRA"), and accordingly, the Court must impose restitution. Given how difficult arriving at a precise estimate of how much Garnett's conduct actually cost DCPS, the government will defer to the Court as to the appropriate means to determine restitution.

### CONCLUSION

WHEREFORE, for the foregoing reasons, the Government respectfully submits that a sentence of 51 months of incarceration, followed by 36 months of supervised release, is a just and appropriate sentence.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:  /s/*Christopher R. Howland*
Christopher R. Howland
Assistant United States Attorney
Fraud, Public Corruption, & Civil Rights
D.C. Bar No. 1016866
601 D Street, N.W.,
Washington, D.C. 20530
202-252-7106
Christopher.Howland@usdoj.gov